# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| TENISHA JAMES and NATASHA JARVIS,<br>　　*Plaintiffs*,<br><br>　　　　v.<br><br>METLIFE GROUP, INC.,<br>　　*Defendant*. | No. 3:20-cv-01113 (JAM) |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

This case principally poses a question of who-knew-what-and-when in the context of an employment claim for unlawful retaliation. Plaintiffs Tenisha James and Natasha Jarvis were employed through a temporary staffing agency at defendant MetLife Group, Inc. ("MetLife"), a major insurance and financial services company. Within hours of James and Jarvis complaining to their agency that they were not being paid for overtime hours they worked, MetLife decided to terminate their positions with the company.

James and Jarvis filed a retaliation claim pursuant to the Fair Labor Standards Act, alleging that MetLife terminated their positions because they had complained that MetLife did not pay for overtime hours. MetLife has now moved for summary judgment, arguing that there is no genuine fact issue to show that it was aware of the complaints made by James and Jarvis to the temp agency. Although MetLife makes a strong showing that it did not know of any complaints made by James and Jarvis, I cannot grant summary judgment in MetLife's favor without intruding on a jury's role to evaluate witness credibility and to consider the inferences to be drawn from circumstantial evidence. Therefore, I will deny the motion for summary judgment.

1

## BACKGROUND

James and Jarvis were employed by AppleOne, a temp agency.[1] MetLife uses AppleOne to staff certain positions, and James and Jarvis were assigned to work for MetLife as Senior Customer Service Representatives ("SCSRs") to process disability insurance claims.[2]

The parties agree that under MetLife's business model for temp agency employees, AppleOne managers do not communicate directly with MetLife managers about the temporary employees furnished to MetLife by AppleOne.[3] Instead, AppleOne and MetLife managers communicate with each other through a Managed Service Provider ("MSP"), which acts as an independent, third-party intermediary.[4] An entity named Hays Talent Solutions ("Hays") served as the MSP for MetLife and Apple One, and Jenna Castrovillari was the Hays employee through whom MetLife and AppleOne communicated regarding James and Jarvis's temporary positions.[5]

From May 18, 2020 to June 29, 2020, James and Jarvis worked as SCSRs in one of MetLife's short-term disability claims units. Their supervisor was Elizabeth Gurekovich, a MetLife employee.[6] Due to the COVID-19 pandemic that broke out in the spring of 2020, James and Jarvis performed their roles remotely.[7]

The SCSR position was an hourly position for which James and Jarvis allege they were entitled to be paid an overtime rate of pay for any hours they worked in excess of 40 hours per week.[8] During an employee orientation, James and Jarvis allege that they were informed that the SCSR position was hourly, and that their hours would be Monday through Friday, from 8:00am

---

[1] Doc. #23-1 at 2 (Statement of Facts (SOF) #1); Doc. #27-2 at 1 (admitting SOF #1).
[2] Doc. #23-1 at 2 (SOF #2); Doc. #27-2 at 1 (admitting SOF #2).
[3] Doc. #23-1 at 3 (SOF #4); Doc. #27-2 at 2 (admitting SOF #4).
[4] *Ibid.*
[5] *Ibid.*
[6] Doc. #23-1 at 2-3 (SOF #3); Doc. #27-2 at 2 (admitting SOF #3).
[7] Doc. #1 at 2 (¶ 8).
[8] *Id.* at 2 (¶ 9).

to 4:30pm.[9] They allege that they were also informed that the position was expected to require only 40 hours of work per week and that employees should not perform overtime work in excess of 40 hours per week without approval from their supervisor.[10]

According to James and Jarvis, Gurekovich assigned them to process at least eight to ten insurance claims per day, and they were expected to complete all of their assigned claims for each day by the end of that same day.[11] They also contend that, once they began processing a particular claim on a particular day, Gurekovich demanded that they fully complete that claim before discontinuing work that day.[12]

James and Jarvis claim that due to these performance expectations, there were days when they had to work later than 4:30pm and exceed 40 hours of work per week.[13] Gurekovich allegedly required James and Jarvis to submit timesheets that omitted any work they performed after 4:30pm and that showed they worked only 40 hours each week.[14] James and Jarvis assert that they asked Gurekovich to pay them overtime, but Gurekovich told them she would not approve overtime because she expected them to complete their work within the 40-hour work week.[15]

On Wednesday, June 24, 2020, James and Jarvis jointly called Brittany Harris, their contact at AppleOne, to complain that they were not paid overtime.[16] Harris told James and Jarvis to complete a written complaint form and provide supporting documentation, which James and Jarvis submitted the next day on Thursday, June 25, 2020.[17] The parties agree that Harris is

---

[9] *Id.* at 2 (¶ 11).
[10] *Id.* at 2 (¶ 12).
[11] *Id.* at 3 (¶¶ 14-15).
[12] *Id.* at 3 (¶ 16).
[13] *Id.* at 3 (¶ 17).
[14] *Id.* at 3 (¶ 18).
[15] *Id.* at 3 (¶ 19).
[16] Doc. #23-1 at 4 (SOF #5); Doc. #27-2 at 2 (admitting SOF #5).
[17] *Ibid.*

employed solely by AppleOne and is not a MetLife employee.[18]

Around noon on the following Monday, June 29, 2020, James and Jarvis each received a phone call from Harris informing them that MetLife had terminated their positions.[19] The parties agree that Gurekovich and her manager at MetLife, Jessica Liquore, made the decision to terminate James and Jarvis's assignments on Thursday, June 25, 2020, the day after James and Jarvis had first complained to Harris about the lack of overtime pay.[20]

A number of communications via text message and email occurred between various individuals involved in both James and Jarvis's overtime complaints and the notification to them of the decision to terminate them. These communications took place from Wednesday, June 24 to Monday, June 29, 2020, and many of these communications have been submitted as exhibits to the parties' respective submissions. Because these communications help to develop the sequence of events that occurred regarding the overtime complaint and the termination decision, and therefore bear on the question of whether MetLife was aware of James and Jarvis's overtime complaint at the time the termination decision was made, I describe these communications in more detail.

### *Wednesday, June 24, 2020*

At 8:13am on June 24, Jarvis emailed Gurekovich, writing that she may have to work after 4:30pm and asking for permission to do so "just to complete a claim I have started in order to avoid a gap."[21] Gurekovich replied at 9:25am, telling Jarvis she "should be completing at least 10 new claims a day. That is the minimum. I know that you have not consistently been able to do

---

[18] *Ibid.*
[19] Doc. #23-1 at 4 (SOF #6); Doc. #27-2 at 2-3 (admitting SOF #6).
[20] Doc. #23-1 at 5 (SOF #7); Doc. #27-2 at 3 (admitting SOF #7).
[21] Doc. #23-12 at 1. One individual in these series of communications worked in Central Daylight Time, while the others worked in Eastern Daylight Time. Doc. #23-4 at 1. This ruling refers to the times that communications occurred solely by reference to Eastern Daylight Time.

that so I have been purposely giving you less than the others. When you complete only 6, that is concerning. There is no overtime to complete your work."[22]

Later that same afternoon, at 3:53pm, Gurekovich emailed James, Jarvis, and a third individual, asking why there were "currently this many outstanding new claims," and stating, "[a]s I indicated to you earlier, you need to be completing at[]least 10 new claims a piece at a minimum per day."[23] Gurekovich added, "If I am being frank, there is a specific job that we need you guys to do. That is to get through these new claims every day accurately and efficiently and that has continuously not happened."[24]

James then emailed Gurekovich at 3:56pm to inform her that James was working on one claim, that she had three claims left, and that she had not had been able to take her full breaks or lunch break as she had to "continue[] to work to catch up."[25] Gurekovich responded to James three minutes later, writing, "Again, at this point, you have been doing this for quite a while and we would still expect you to get through your ten new claims."[26] Two minutes later, James wrote back, "Typically I do[,] all I can do is try as best as I can with what I am working with and the knowledge that I was taught. There will be days that this is beyond my control[,] I appreciate your feedback."[27]

At some point in the evening of June 24, James and Jarvis jointly called Harris to complain about MetLife and Gurekovich, and in particular their overtime situation.[28] James and Jarvis allege that Harris told them that they were entitled to be paid at an overtime rate for all

---

[22] *Ibid.*
[23] Doc. #23-13 at 2.
[24] *Id.* at 1.
[25] *Ibid.*
[26] *Ibid.*
[27] *Ibid.*
[28] Doc. #23-1 at 4 (SOF #5); Doc. #27-2 at 2 (admitting SOF #5).

5

hours worked in excess of 40 hours per week.[29] James and Jarvis also state that they submitted proof to Harris in the form of emails and other documentation to show that they had indeed worked past 4:30pm on certain days.[30] Harris told James and Jarvis that she would speak with MetLife and told them to submit time sheets that showed any overtime worked going forward.[31]

### Thursday, June 25, 2020

At 3:48pm on June 25, James texted Harris, "I will be working on the form you sent me shortly."[32] This was apparently in reference to the call James and Jarvis had with Harris the night before.

At 4:22pm, Gail Teel, a project manager at AppleOne, sent an email to Jenna Castrovillari, the Hays employee who acted as an intermediary between AppleOne and MetLife. Teel also copied Harris on the email and wrote, "I was just made aware of some issues with a manager in Connecticut by the name of Elizabeth 'Liz' Gurekovich. Both Natasha Jarvis and Tenisha James are in fear of losing their job[s]."[33] Teel then listed a number of issues reported by James and Jarvis in a bullet point list, including that they had worked overtime but did not claim overtime hours and that Gurekovich said they would not get overtime.[34]

Castrovillari then sent an email to Teel at 4:48pm, writing, "Thanks—I will definitely look into this—what is the extent that you want me to share with the manager?"[35] Teel replied at 5:00pm, writing, "I don't think there is a limit on what can be shared as long as it is done professionally and the fact that our employees came to their employer with concerns is not held

---

[29] Doc. #1 at 3 (¶ 21).
[30] *Id.* at 4 (¶¶ 22-23).
[31] *Id.* at 4 (¶¶ 24-25).
[32] Doc. #23-11 at 2.
[33] Doc. #23-14 at 2.
[34] *Ibid.*
[35] Doc. #23-15 at 2.

6

against them."[36] Teel also told Castrovillari to use the reply-all function in the email with Harris, as Teel would be out of the office the next day, Friday, June 26.[37]

At 7:04pm on the evening of June 25, Gurekovich texted Liquore, "FYI I'm sending the email to get rid of those two temps. I went through their work / they both didn't do even close to 10 claims and the ones they did do had errors."[38] Liquore responded that she "support[ed] this," and Gurekovich wrote back, "I just went through all their claims. I'm done Jess. We'll figure it out some other way" and that "the cs's are trying not to complain about help but it's not really even help At this point."[39] Several minutes after that text message exchange between Gurekovich and Liquore, Gurekovich sent an email at 7:14pm to Castrovillari, stating, "Please end the contracts for the individuals Tenisha James and Natasha Jarvis. Both are performance issues. Please have this done first thing Friday. (today when you are reading this)."[40]

Gurekovich states in her declaration that prior to the steps she took to terminate the services of James and Jarvis, she was not aware of their complaint to AppleOne about overtime and that James and Jarvis had never complained to her directly about overtime.[41] Liquore similarly states in her declaration that she was unaware of James and Jarvis's overtime complaint at the time she exchanged text messages with Gurekovich and approved the termination decision on the evening of June 25.[42] For her part, Castrovillari states in her declaration that at the time Gurekovich's 7:14pm email arrived in her inbox, she had not told Gurekovich or anyone else at MetLife about James and Jarvis's overtime complaint.[43]

---

[36] Doc. #23-16 at 2.
[37] *Ibid.*
[38] Doc. #23-17 at 2.
[39] *Ibid.*
[40] Doc. #23-18 at 2.
[41] Doc. #23-5 at 1 (¶ 7).
[42] Doc. #23-7 at 1 (¶ 7); Doc. #26 at 1 (¶ 7) (amended declaration of Jessica Liquore).
[43] Doc. #23-4 at 2 (¶ 8).

7

At this point on the evening of June 25, both Teel's email with more details on James and Jarvis's overtime complaint as well as Gurekovich's email with the termination decision were sitting in Castrovillari's inbox. But according to Castrovillari, by the time Teel sent her last email at 5:00pm, and long before Gurekovich sent her 7:14pm email, Castrovillari had already "left for the day."[44] Castrovillari clarified in her supplemental declaration that she worked remotely and that by "left for the day," she meant that she had logged out of her work computer.[45] Castrovillari further stated that when she is logged out of her work computer, she "cannot receive any emails that are sent to [her] MetLife email account."[46] As Castrovillari tells it, she did not see either email on the evening of June 25.[47]

*Friday, June 26, 2020*

Castrovillari also attests that she did not see either email on June 26, the last day before the weekend. According to Castrovillari, she was "out all day on Friday, June 26 because [she] took a PTO [paid time off] day."[48] Castrovillari's assertion that she took a PTO day on June 26 is supported by an email calendar invite sent from her supervisor to Castrovillari with the subject line: "Accepted: Jenna PTO" and dated to run all day on June 26.[49] Castrovillari maintains that because she logged off on June 25 before seeing either Teel or Gurekovich's emails, and because she took a PTO day on June 26, she did not see either email until she returned to work on Monday, June 29.[50]

At 2:07pm on June 26, James texted Harris, "I sent you an email to review can you please

---

[44] Doc. #23-4 at 1-2 (¶ 7).
[45] Doc. #29-2 at 2 (¶ 28).
[46] *Ibid.*
[47] Doc. #23-4 at 1-2 (¶¶ 7-9).
[48] *Ibid.*
[49] Doc. #29-5.
[50] Doc. #23-4 at 1-2 (¶¶ 7-9).

8

take a look and get back to me when you get a chance. Thanks."[51] Harris texted back two minutes later, "Yes. Also last night my big boss sent an email up to the company."[52]

At 2:27pm, Harris emailed Castrovillari with an attachment of the written complaint from James and stating: "Gail sent you over an[] email yesterday, and today I received this from one of the employees. Please review."[53] According to Castrovillari, because she took a PTO day on June 26, she did not see Harris's email until June 29.[54]

*Monday, June 29, 2020*

At 8:32am on June 29, Castrovillari sent an email to Harris, copying Teel.[55] This email references by subject line the email of 2:27pm on June 26 from Harris that contained James's written complaint.[56] Castrovillari wrote, "Yes, and I responded and asked how much detail you would like for me to provide or what the end result you are looking for?"[57]

Three minutes later, at 8:35am, Castrovillari sent an email to Teel and Harris, stating, "Unfortunately, I received an email that both assignments need to be terminated effective Friday 6/26. Please handle immediately. I will speak to the manager and get as much information as possible. I was OOO [out of the office] so going through all my emails now."[58]

Two minutes later, at 8:37am, Castrovillari sent an email to Gurekovich, copying Liquore and writing, "Apologies I was OOO Friday. I just saw this email. Please see the email below that I received from the agency. Let me know if there are any additional details I can provide and if we should move forward with a termination."[59] In this email, Castrovillari then copied and

---

[51] Doc. #23-11 at 2.
[52] *Ibid.*
[53] Doc. #23-19 at 2.
[54] Doc. #23-4 at 2 (¶¶ 10-11).
[55] Doc. #23-20 at 2.
[56] *Ibid.*
[57] *Ibid.*
[58] Doc. #23-21 at 2.
[59] Doc. #23-22 at 2.

9

pasted the text from Teel's email of 4:22pm on June 25 that listed James and Jarvis's complaints about Gurekovich, including the overtime complaint.[60]

Liquore replied at 9:02am, writing, "At this time, we would like to move forward with the termination of these 2 temps. Both associates were given the task of working up new claims. They were both trained and provided with ongoing coaching on how to complete these tasks. [Gurekovich] has had to have several conversations regarding the amount of work that was being completed."[61] Liquore also described various alleged performance issues with James and Jarvis.[62] Castrovillari acknowledged Liquore's confirmation of the termination decision via email four minutes later, at 9:06am.[63]

At 9:07am, Castrovillari emailed Harris and Teel, confirming that the termination of James and Jarvis should move forward, and she copied and pasted the complaints about James and Jarvis's job performances from Liquore's 9:02am email.[64]

Castrovillari attests that she "never had a phone conversation" with Gurekovich or Liquore at MetLife, or with Harris and Teel at AppleOne, and that all communications between them occurred via email.[65] Castrovillari also states that she did not inform anyone at MetLife about James and Jarvis's overtime complaint until the morning of June 29.[66] As for the AppleOne employees, Harris states in her declaration that she never communicated directly with Gurekovich or any other MetLife managers about James and Jarvis's overtime complaint.[67] And Teel states in her declaration that she also did not communicate with anyone at MetLife directly

---

[60] *Ibid.*
[61] Doc. #23-23 at 2.
[62] *Ibid.*
[63] Doc. #23-24 at 2.
[64] Doc. #23-25 at 2.
[65] Doc. #23-4 at 3 (¶ 15).
[66] *Ibid.*
[67] Doc. #23-6 at 1-2 (¶ 6).

10

about the overtime complaint.[68]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve closely contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

Congress enacted the Fair Labor Standards Act ("FLSA") to "protect workers and ensure that they are not subjected to working conditions 'detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 243 (2d Cir. 2011) (quoting 29 U.S.C. § 202(a)). In furtherance of this goal, the FLSA imposes numerous "wage and hour" requirements, including an overtime provision mandating employers pay non-exempt employees time-and-a-half for each hour worked in excess of 40 hours per week. *See* 29 U.S.C. § 207(a)(1).

The FLSA further prohibits employers from retaliating against employees who seek enforcement of its provisions. *See* 29 U.S.C. §215(a)(3). In order to establish a retaliation claim, a plaintiff must show that they participated in protected activity known to their employer, such as

---

[68] Doc. #23-8 at 2 (¶ 6).

11

making an overtime complaint, and that, because of their participation in this protected activity, they were subject to an adverse action by their employer. *See Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).[69] Of course, unless a plaintiff can prove that the employer actually knew of the plaintiff's protected activity, the plaintiff cannot prove that the employer engaged in unlawful retaliation because of the plaintiff's protected activity. *See, e.g.*, *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (evaluating employment retaliation claims in the Title VII context).

Here, MetLife has made a powerful showing that the relevant decisionmakers—Gurekovich and Liquore—did not know of the complaints by James and Jarvis at the time they agreed on the evening of June 25 to terminate their positions. But the problem is that I cannot rule in MetLife's favor without ultimately engaging in a credibility determination. I would have to decide, for example, that no reasonable jury could conclude that Castrovillari told Gurekovich or Liquore (or someone else at MetLife who relayed this information to Gurekovich or Liquore) about the complaints on the afternoon of June 25 before Gurekovich and Liquore decided to terminate their positions that same evening.

It is true that there is no documentary "smoking gun" in the plaintiffs' favor. To the contrary, it could be said that the documents weigh heavily in MetLife's favor and might well prove devastatingly dispositive at trial. But trials are about much more than documents. They are about the jury's evaluation of witness credibility—a role that is forbidden to a judge when deciding whether to grant a motion for summary judgment. And trials are not only about direct evidence (such as what a particular person wrote in an email) but also about circumstantial evidence (such as what to infer from the tone and timing of an email and the overall context of

---

[69] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

the parties' relationships).

What might a reasonable jury do here? They might consider the fact that Castrovillari's very job was to *communicate*—to be the go-between for AppleOne and MetLife—and that MetLife's theory of the case requires the jury to conclude that Castrovillari was suspiciously derelict in her duty (not just on Thursday, June 25 but for the next day and the rest of the weekend). They might consider that in an age when corporate employees tend to be tethered and responsive to computers and electronic devices 24/7, there is reason to doubt that Castrovillari did not immediately do something to alert MetLife about the plaintiffs' overtime complaint. Her last email on June 25 arguably reflects a keen awareness of the need to advise MetLife and also to regulate the flow of information: "Thanks—I will definitely look into this—what is the extent that you want me to share with the manager?"[70]

A reasonable jury might also think about where Castrovillari's loyalties lie. Do they lie with the large client corporation (MetLife) that retains her company (Hays) and that furnishes her with an on-site location and email address? Or do they lie with two temp workers she does not know?

A reasonable jury might ponder whether Castrovillari would think strategically about precisely what should be put down in writing and what should be communicated without any readily ascertainable paper or electronic trail for later investigators or litigants to discover.[71] Jurors might be persuaded in light of their everyday employment experience that professionals like Castrovillari who are in the HR field are attuned to litigation risk and the careful cultivation

---

[70] Doc. #23-15 at 2.
[71] My concerns are not redressed by the phone records that defendants decided to submit only by way of a reply declaration, because these records do not conclusively show that no communication occurred in some form that is not traceable or that has not otherwise found its way into the record in this case.

13

and manicure of a documentary record.[72]

A reasonable jury might additionally conclude that Gurekovich had learned of and spoken to Liquore about the plaintiffs' complaint when she texted Liquore on the evening of June 25. She wrote: "FYI I'm sending the email to get rid *of those two temps*. I went through their work / they both didn't do even close to 10 claims and the ones they did do had errors."[73] This reference to "those two temps" is suggestive of an immediate prior communication of some sort about them, arguably prompted by learning shortly before that "those two temps" had lodged a complaint about the failure to pay them overtime.

All in all, a reasonable jury might decide not to credit Castrovillari's account that she took no steps to alert MetLife to the plaintiffs' complaints between 4:22 pm on June 25 when she received the complaint and a few hours later at 7:14pm when Gurekovich told Castrovillari to terminate the plaintiffs' positions. And if a reasonable jury were to conclude that Gurekovich somehow learned of the plaintiffs' complaints, then the almost immediate temporal proximity of the adverse job action combined with the context of Gurekovich's own dealings with the plaintiffs might well convince the jury that the adverse action was retaliatory in nature.

There are too many possibilities—yes, unlikely perhaps but not altogether speculative—that foreclose me from granting MetLife's motion for summary judgment. MetLife might win the proverbial battle of the documents while ultimately losing the war of witness credibility and

---

[72] Note, for example, the written response that Teel made to Castrovillari's inquiry on June 25 about what could be shared with MetLife management about the plaintiffs' overtime complaint: "I don't think there is a limit on what can be shared as long as it is done professionally *and the fact that our employees came to their employer with concerns is not held against them*." Doc. #23-16 at 2 (emphasis added). On the one hand, a jury might conclude that the emphasized text is consistent with Teel's conscientious effort to guard against any possibility of retaliation. On the other hand, a jury might conclude that the emphasized text is not responsive to Castrovillari's query, that Teel had one eye on the careful crafting of a documentary record that might one day end up (as it has) in litigation, and that this acute awareness of the possibility of retaliation raises the likelihood that Gurekovich or Liquore were alerted about the plaintiffs' complaint before their later text exchange on the evening of June 25, 2020.
[73] Doc. #23-17 at 2 (emphasis added).

circumstantial inference.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment (Doc. #23) is DENIED.

It is so ordered.

Dated at New Haven this 12th day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge